**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| YOLANDA CERRILLO, | ) | 1:08-CV-1147  AWI SMS |
| | ) | |
| Plaintiff, | ) | ORDER ON DEFENDANTS' |
| v. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT AND |
| WEST PARK ELEMENTARY SCHOOL | ) | REMANDING CASE TO THE |
| DISTRICT, STEVEN IRBY, RALPH | ) | FRESNO COUNTY SUPERIOR |
| VIGIL, and DOES 1-10, inclusive, | ) | COURT |
| | ) | |
| | ) | (Doc. No. 31) |
| Defendants. | ) | |
| | ) | |

This case was removed from the Fresno County Superior Court on the basis of federal question jurisdiction.  The case arises from the termination of Plaintiff Yolanda Cerrillo's ("Cerrillo") employment with the West Park Elementary School District ("the District").  Cerrillo has brought claims of wrongful discharge, violations of the California Labor and Education Codes, and 42 U.S.C. § 1983.  Defendants move for summary judgment.  For the reasons that follow, the motion will be granted as to Cerrillo's federal claim and the case will be remanded.

## FACTUAL BACKGROUND[1]

Cerrillo was hired by the District as the assistant to West Park Elementary School principal Steven Irby ("Irby") on June 17, 2008.  DUMF 1.  As a new employee with the District,

---

[1]"DUMF" refers to Defendants' Undisputed Material Facts, "PUMF" refers to Plaintiff's Undisputed Material Facts, "PRDUMF" refers to Plaintiff's Response to Defendants' Undisputed Material Facts.  Additionally, both parties have filed numerous objections to various items of evidence.  The Court addresses some of the objections in more depth in this order.  Other objections are either without merit or will not change the outcome of this order.

Cerrillo was a probationary employee.  See DUMF 2.  Cerrillo testified that she knew she would be on probation for a period of time when she was hired and was told that the period would be six months.  DUMF 3.  Pursuant to the District's policy for non-classified employees, probationary employees may be released without cause during their probation.  DUMF No. 4.

When Cerrillo began this job with the District, she had over 28 years of experience as an administrative assistant.  See PUMF 1.  In her previous position at a busy court reporting company, Cerrillo managed multiple phone lines, customers, and crises, and had many of the same responsibilities as her position at West Park.  PUMF 2.

With Irby's permission, Cerrillo reorganized certain aspects of the office; according to Irby, Cerrillo reorganized where various forms were kept.  See PUMF 4;[2] Irby Deposition at 75. Irby repeatedly told her that he appreciated the great work she did.  PUMF 5; see also PUMF 3. However, within a few months after Cerrillo began working for the District, several District staff formed the opinion that Cerrillo did not have adequate multi-tasking skills that the District required to work in the busy school office.  See DUMF 5; PRDUMF 5.[3]  Specifically, within a few months after Cerrillo began working for the District, District staff observed that Cerrillo failed to answer the phones properly, failed to transfer calls properly, failed to take messages as instructed, was resistant to training offered by co-workers familiar with her job duties, and was weak in her knowledge and use of the Excel computer program.  DUMF 6.[4]  District staff also

---

[2]PUMF 4 states in part that Cerrillo changed the "systems to maximize efficiency."  Defendants object in part that the PUMF lacks foundation and is an improper opinion.  The Court agrees in part.  There is no description of what Cerrillo did to "maximize efficiency" nor is there an adequate foundation that she can testify about maximizing efficiency.  Such testimony would appear to require specialized knowledge/expertise and would thus fall outside the realm of a permissible lay opinion.  See Fed. R. Evid. 701.  However, as Irby's deposition demonstrates, there is no dispute that Cerrillo made changes.  The Court will consider that she made changes, but not that she "maximized efficiency."

[3]The DUMF states that Cerrillo did not have the necessary skills to perform the job.  Cerrillo indicates that she had 28 years of experience, including experience with multitasking.  See PUMF Nos. 1, 2.  The Court will consider Cerrillo's experience.  However, it does not change the conclusion that the evidence clearly shows that contrary opinions had been formed, cf. Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996), and, as discussed in DUMF 6, complaints had been made about her performance.

[4]Cerrillo disputes this DUMF by arguing that no one ever told her that she was not answering the phones properly, no one ever told her that complaints had been made, and that there is no written record of any problems with her work performance prior to the conclusion of jury service.  However, none of these points dispute the evidence that shows that complaints and observations were made.

received several complaints about Cerrillo's poor handling of telephone calls to the elementary school.  Id.

Cerrillo worked from June 18, 2007, to October 9, 2007, before appearing for jury service and being selected as a juror in a case entitled *Stacy Johnson-Klein v. Fresno State University* ("the Klein Case") on October 10, 2007.[5]  See DUMF 7.  Cerrillo informed Irby that she had been called for jury duty approximately one week before she was to report for jury service, and that, in response, Irby asked her to let him know more as the date of her service approached.  DUMF 11.  She let Irby know more in a subsequent conversation, and in response he said "okay" and that he would have one of Cerrillo's co-workers come in early.  Id.

On October 10, 2007, Cerrillo began jury service, which required her to be absent from work four days a week (Monday through Thursday, but she would work on Fridays) until and including December 6, 2007.  See DUMF Nos. 10, 14; PUMF Nos. 6, 9.  Also on October 10, Cerrillo informed Irby that she had been selected as a juror in the Klein Case, that the trial would take approximately four to six weeks, and that she would be on the jury four days out of the week.  DUMF 13; PUMF 7.  When Cerrillo informed Irby that she had been selected for the jury in October 2007, Irby did not express any objection to her jury service.  DUMF 15.  Cerrillo informed Irby that she was required to sign a form if she would be paid during the time that she was on jury duty, and Irby responded that she would be paid while on jury duty.  See DUMF 12.

Around Thanksgiving 2007, Cerrillo told Irby that the Klein Case was extending into December 2007; in response, Irby said "okay."  See DUMF 16; see also PUMF 8.  District Superintendent Ralph Vigil ("Vigil") instructed Cerrillo not to divulge the details of the Klein Case, and except for a conversation Cerrillo says she had with District employee Yolanda Padilla

---

Cerrillo also makes evidentiary objections to almost all of the evidence cited in support of DUMF 6. Cerrillo's primary objection is hearsay.  However, while Vigil and Irby do relate the substance of what other persons told them about Cerrillo, the testimony is important because it shows that complaints about Cerrillo were made, Irby and Vigil were aware of these complaints, and Irby and Vigil considered these complaints.  Thus, the pertinent testimony is considered to show belief and that complaints were made.  The remaining objections are either without merit or do not sufficiently undermine the DUMF.  Accordingly, DUMF 6 is undisputed.

[5]The Klein Case involved allegations of sex discrimination against administrators at California State University – Fresno (hereinafter "FSU").  See Albert Decl. Exhibit 6.

1  ("Padilla"), at no time during the eight weeks that Cerrillo was on jury duty did she discuss her

2  jury service with Vigil.  See DUMF 17.  The District paid Cerrillo for the eight weeks she missed

3  work for jury service.  See DUMF 18.

4      Prior to Cerrillo missing work for jury service, Irby and Vigil had a discussion about their

5  concerns about Cerrillo's inadequate job performance in August or September 2007.  DUMF No.

6  8.[6]  The gist of the conversation was that Cerrillo might be terminated before becoming a

7  permanent employee.  Id.  At management meetings (attended by *inter alia* Irby, Vigil, and

8  Charter School Administrator Elizabeth Hammond) the attendees discussed releasing Cerrillo

9  from her position at the District prior to the expiration of her six month probationary period

10 because of the noted deficiencies in her performance.  DUMF No. 9.[7]  Such meetings occurred

11 within a few months after Cerrillo began her employment with the District, and prior to Cerrillo

12 being off work for jury duty.  Id.

13      While on the jury, Cerrillo faced trouble at work due to jury service.  PUMF 10.

14 Specifically, Padilla, who is in charge of payroll, told Cerrillo that she was missing too much

15 time for jury service.  PUMF 11.  Cerrillo had been asking Padilla if she could have a necessary

16 training rescheduled to accommodate Cerrillo's jury service, and Padilla showed frustration and

17 anger about the request.  PUMF 14.  Padilla told Cerrillo that she (Padilla) was going to have to

18 give a lot of Cerrillo's responsibilities to another employee.  PUMF 12.  Because of Padilla's

19 statements, Cerrillo felt like she had to fight for her job.  PUMF 13.  The exchange between

20

21

22     [6]Cerrillo disputes DUMF 8 by making objections to the deposition testimony that forms its basis and by
   arguing that no written record exists of such conversations.  The objection is hearsay.  However, the evidence is
23 admissible to show that a conversation took place and to show Vigil and Irby's beliefs regarding Cerrillo's
   performance.  The argument that there is no written documentation creates no dispute since there is no evidence that
   written documentation was required to be generated for such a conversation.  DUMF 8 is undisputed.

24

25     [7]Cerrillo levels the same objections to DUMF 9 as she did for DUMF 8 except that she also objects that Liz
   Hammond's declaration at ¶ 4 lacks personal knowledge of Cerrillo's job performance.  However, that paragraph
26 does not purport to describe Cerrillo's performance.  Rather, the paragraph relays that discussions about Cerrillo's
   performance occurred at meetings, the discussions were negative, and there was consideration of terminating Cerrillo
   prior to her six month probation.  See Hammond Decl. at ¶ 4.  As someone who attended the management meetings,
27 she would clearly have personal knowledge of what was said at those meetings.  The objection is overruled.  Also,
   with respect to the assertion that there is no documentation of the conversations, there is no evidence that Cerrillo
28 requested these minutes of the management meetings, that the conversations were recorded, or that the conversations
   were required to be recorded.  For similar reasons that DUMF 8 is undisputed, DUMF 9 is also undisputed.

Cerrillo and Padilla happened in front of Vigil, and he said nothing about the impropriety of Padilla's comments to Cerrillo. PUMF Nos. 15, 16.

As a probationary employee, Cerrillo was still learning the tasks of her position. PUMF 18. Irby stated that the reason there is a six month probation period is because that is how long it takes to give an employee a chance to perform. PUMF 20. Cerrillo did not get the full six months to learn and improve but rather spent two months of her probation on a jury, working very hard to keep up on the days she was at work. PUMF 21. Cerrillo also had the difficult task of working only one day a week for eight weeks. PUMF 17. Only being in the office on Fridays meant that Cerrillo had to learn how to do her job while catching up on everything that happened the previous week. PUMF 19.

Part of Cerrillo's duties included the prompt answering of phones and transferring of calls properly. PUMF 22. No one at West Park or the District ever told Cerrillo that she was not answering or transferring calls properly.[8] PUMF 23. No one at West Park or the District made any written documentation regarding Cerrillo improperly handling her phone duties prior to the end of her jury service. PUMF 24. Cerrillo's duties also included taking messages for West Park and District employees. PUMF 26. At West Park, Cerrillo used a system for tracking messages that she had used during her 28 years of experience as an administrative assistant. PUMF 27. Cerrillo kept a ledger for herself and then transferred the information to messages to give to the intended recipient. PUMF 28. The message tracking system used by Cerrillo was the same system that Cerrillo had used in her previous employment. PUMF 29. Cerrillo showed her message tracking system to Irby and he approved. PUMF 30. There is no written record of any complaints about the method Cerrillo used to take messages and no one at West Park or the District ever told Cerrillo there was a problem with her system. PUMF 31. Cerrillo declares that she capably handled the duties of her job. PUMF 25.

The Klein jury reached its verdict on December 6, 2009, and Cerrillo returned to work on December 7, 2007. See DUMF 19; PUMF Nos. 46, 47. When she returned to work on

---

[8]Cerrillo did receive materials regarding telephone etiquette from Cassandra Simpson on October 19, 2007. See Albert Dec. Exhibit 9.

December 7, 2007, Cerrillo told Irby that she had been the Jury Foreperson and that the media might be calling her at school.  See DUMF 20; PUMF Nos. 61-63.  At no time did Cerrillo inform Irby or Vigil what verdict the jury reached in the Klein Case.  See DUMF 24.

After Cerrillo told Irby about her role on the Klein jury, Cerrillo declares that both Irby and Vigil "engaged in a pattern of hostility towards her."  PUMF 64; Cerrillo Decl. at ¶ 45. Prior to telling Irby about her role on the Klein Case jury, Cerrillo declared that she had frequent interactions with both Irby and Vigil and they were always friendly to her.  See PUMF Nos. 3, 65.  Cerrillo testified that when she returned to work following jury service, she thought that Irby and Vigil were hostile and cold toward her, but that Irby never said anything hostile toward her. See DUMF 25; PUMF 66.  Cerrillo also thought that Vigil was ignoring her, did not say "hello," and was looking at her with "evil eyes," but she admitted that was just a feeling she had.  See DUMF 26;[9] PUMF 67.  Cerrillo declares that the tone of her regular meetings with Irby changed drastically.  See PUMF 68.  Whereas before Cerrillo told Irby she had been the jury foreperson in the Klein Case, the meetings with Irby had been friendly and joking, now Irby was quiet and unfriendly in the meetings.  PUMF 69.  Cerrillo declares that this behavior was in "stark contrast" to Irby and Vigil's behavior prior to Cerrillo making it known that she was the foreperson of the Klein Case jury.  See PUMF 70.

After work on December 11, 2007, Cerrillo appeared in two television news interviews discussing the Klein Case.  Cerrillo watched her interview on one of the channels on the 6:00 p.m. news.  PUMF 71.  In those interviews, Cerrillo stated that she thought the verdict was the correct one and that the amount was appropriate.  PUMF 72.  The West Park Elementary School District School Board held a meeting on the evening of December 11, 2007.  PUMF 73.

Irby made the decision to terminate Cerrillo, which Vigil authorized.  PUMF 76.  On December 12, 2007, while Cerrillo was still on probation, the District released her from her employment with the approval of the District's Board of Trustees.  DUMF No. 27; PUMF 74. That day, Cerrillo was informed that she was being released from her employment with the

---

[9]Cerrillo also testified that Vigil did not act himself around her and turned his back on her, but that Vigil only treated her in an unfriendly manner one time – December 11, 2007.  See Cerrillo Depo. at 257:19-258:20.

District at a meeting with Irby and Casandra Simpson ("Simpson"), who is the District's head of Human Resources.  See DUMF No. 28; PUMF 75.  At no point during that meeting did Irby or Simpson mention Cerrillo's jury service.  Id.  Cerrillo was not given a reason for her release from her employment with the District and she has no knowledge as to why she was released from her employment.  PUMF Nos. 29, 30.  Cerrillo had been at work three days between her return to work and her termination.  PUMF 77.  Cerrillo declares that she had no notice that there were any deficiencies in her work performance prior to her termination.  PUMF 44.  Following her release from employment, Cerrillo was issued her final paycheck on the normal pay cycle (once a month) on December 31, 2007.  DUMF 35.

Irby testified that he had recommended to Vigil that Cerrillo's employment be terminated before the end of her probation because Irby did not believe that she had the required skills for the position.  See DUMF 32.[10]  Irby declares that he did not take Cerrillo's jury service on the Klein Case into account, or consider the Klein Case in any way, in recommending that Cerrillo be released from her employment with the District.  See DUMF 33.[11]  The only statements that Cerrillo testified making to Irby regarding her jury service were that: (1) she was called to serve, (2) she needed to fill out a form stating whether she would be paid during the time that she was on jury service, (3) she was selected for the jury in the Klein Case, (4) the case would last four to six weeks, (5) she would be on jury service four days a week (Monday through Thursday) and would report to work on Fridays, (6) the trial had been extended into December 2007, and (7) the trial was over, she had been the foreperson, and the media might be calling the District.  DUMF 21.  Vigil and Irby declare that they took no interest in the Klein Case or the verdict therein, nor

---

[10]Cerrillo disputes this DUMF by stating that no written documentation was generated as to her deficiencies and no one ever told her that there were deficiencies.  However, this does not dispute the proposition that Irby had formed the opinion that Cerrillo lacked the necessary skills.  Cerrillo also objects to a portion of Irby's deposition that is cited in support of this DUMF.  The objections are hearsay and impermissible opinion testimony.  First, there is no hearsay as Irby is simply explaining why he believed Cerrillo was not "a good fit."  See Fed. R. Evid. 801.  Second, the opinion is admissible because it is clearly based on his observations of Cerrillo, it is not based on specialized expertise or knowledge, and it is helpful to determining whether a retaliatory termination occurred.  See Fed. R. Evid. 701.

[11]Cerrillo points to her evidence regarding the notoriety of the case, Vigil's connection to FSU, changes in Vigil and Irby's demeanor, and the presence of the local paper in the lunch room.  See PRDUMF 33.  The Court will consider Cerrillo's evidence in analyzing the motion.  See id.

1   did they follow the case in the media.  See DUMF 31.[12]

2   The District does not have any policy of encouraging employees to seek exemption from

3   jury service, and at no time did Vigil or Irby encourage Cerrillo to seek an exemption from

4   serving on the Klein Case.  DUMF 34.  Cerrillo freely admits that neither Vigil nor Irby ever told

5   her that they were unhappy that she was serving on the Klein Case, neither instructed her not to

6   serve, and neither told her that she was taking too much time from work for jury service.  See

7   DUMF 22.[13]  Cerrillo freely admits that no one at the District prevented her from doing jury

8   service, that no one employed by the District or on the District's Board of Trustees instructed her

9   not to serve as a juror or requested that she not serve as a juror, and that no one at the District

10   denied her the right to serve on the jury.  DUMF No. 23.[14]

11   The District receives the *Fresno Bee* newspaper on a daily basis, and a copy of that paper

12   would frequently be in the staff lunch room.  See PUMF Nos. 50, 51.  The staff lunch room is

13   very small.  PUMF 53.  Both Vigil and Irby regularly eat lunch in the staff lunch room.  PUMF

14   52.  Both Irby and Vigil claim that they had no interest in a lawsuit that was regularly on the front

15   page of a newspaper delivered to the room where they ate lunch.  PUMF 54;[15] cf. DUMF 31.

16   Vigil claimed that he was unaware of the size of the verdict.  PUMF 55.  However, on the day

17   Cerrillo returned to work, the *Fresno Bee* headline covering the top of the front page of the paper

18   announced the $19.1 million verdict in favor of plaintiff.  PUMF 56.  That headline was in large

19   print, was above a picture of the plaintiff and her two attorneys, and took up over half of the front

20   page.  See PUMF Nos. 57, 58.  On the day the *Fresno Bee* announced the size of the verdict,

21

22   [12]Cerrillo points to her evidence regarding the notoriety of the case, Vigil's connection to FSU, changes in

23   Vigil and Irby's demeanor, and the presence of the local paper in the lunch room.  See PRDUMF 31.  The Court will consider Cerrillo's evidence in analyzing the motion.  See id.

24   [13]Again, Vigil was present and was silent when Padilla told Cerrillo that Cerrillo was missing too much time

25   on jury service.  See PUMF Nos. 15, 16.

26   [14]Cerrillo references Padilla's comments in front of Vigil in response to this DUMF.  As noted earlier, the Court will consider this evidence.

27   [15]The PUMF also says that Irby and Vigil claim that they were not aware of the lawsuit.  However, it is

28   undisputed that Cerrillo herself told Irby that she was serving on the Klein Case.  DUMF 12.  Further, Vigil testified that he was aware of the Klein Case through Cerrillo.  See Vigil Depo. at 19.  Thus, they do not claim that they were "unaware" of the lawsuit.

Cerrillo saw Vigil sitting at the table in the staff lunch room, with the newspaper on it.[16]  PUMF

59.  Vigil received his Masters degree in psychology of sport from FSU.  PUMF 60.

Despite the District's response to an interrogatory that it told Cerrillo "many times" to

improve her job performance, Irby, her supervisor, stated that he never told her she was not doing

a good job.  See PUMF 32.  Irby stated that Cerrillo was "by no means ... doing something so

horrific that it needed to be addressed right away."  PUMF 33.  Vigil never spoke with Cerrillo

about the alleged problems with her work performance.  PUMF 34.  There is no written record of

any of the claimed deficiencies in Cerrillo's work performance created prior to the completion of

her jury duty.[17]  PUMF 41.  Padilla, who claims to be the one who trained Cerrillo, said that she

offered Cerrillo help but did not tell her that her job performance was deficient.  PUMF 35.

Simpson stated that she discussed Cerrillo's job performance with Padilla on numerous

occasions whereas Padilla denied ever discussing Cerrillo's job performance with Simpson.

PUMF 36.  The only written record of any comment about Cerrillo's job performance came from

Simpson.  PUMF 37.  Simpson sent Cerrillo an e-mail with an attachment regarding telephone

etiquette.  See PUMF 38; Albert Dec. Exhibit 9.  In the e-mail's text, Simpson tells Cerrillo and

another employee to "keep up the good work."  PUMF 39.  Contrary to this documentary

evidence, Defendants claim that Simpson offered Cerrillo a written handout regarding telephone

etiquette and that Cerrillo refused to take it and stated that she did not need it.  See PUMF 40.[18]

The District has a policy (BP 4216) that states, in part, that probationary employees shall

receive written performance evaluations by their supervisors during the probationary period.  See

PUMF 42.  No one ever conducted the performance evaluations for Cerrillo that are mandated by

BP 4216.  See PUMF 43.  Cerrillo never had the chance that the School Board mandates to get

feedback and improve on any alleged deficiencies.  See PUMF 45.

---

[16]Cerrillo does not state that Vigil was reading the paper or what page was showing when he was present.

[17]No party has submitted written records of Cerrillo's alleged deficiencies that were created after completion of her jury duty.

[18]An interrogatory response is the only evidence cited in support of the PUMF.  However, the interrogatory response does not give a time frame.  As such, it is unclear whether the e-mail and the interrogatory response are dealing with the same incident.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103.  The

1 opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

2 instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for

3 trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting

4 Fed. R. Civ. Pro. 56(e)).

5        The evidence of the opposing party is to be believed, and all reasonable inferences that

6 may be drawn from the facts placed before the court must be drawn in favor of the opposing

7 party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad,

8 Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

9 and it is the opposing party's obligation to produce a factual predicate from which the inference

10 may be drawn.  See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006);

11 UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

12 material fact does not spring into being simply because a litigant claims that one exists or

13 promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

14 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

15 Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

16 "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

17 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

18 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

19 circumstances to consider materials that are not properly brought to its attention, but the court is

20 not required to examine the entire file for evidence establishing a genuine issue of material fact

21 where the evidence is not set forth in the opposing papers with adequate references.  See

22 Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

23 Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

24 to produce evidence sufficient to create a genuine issue of material fact, the moving party is

25 entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

26

27

28

### I.     42 U.S.C. § 1983 – Retaliation in Violation of the First Amendment

*Defendants' Argument*

Defendants argue that Cerrillo is relying on her own subjective and unsupported belief that Defendants had a discriminatory motive.  Cerrillo can point to no statements that she made on a matter of public concern that either Vigil or Irby knew about, let alone motivated her termination.  Cerrillo only told Vigil and Irby that she had been summoned for jury service, a form needed to be filled out regarding pay, that the trial would last 4 to 6 weeks, that the trial had been extended, and that she was the foreperson.  She never discussed the issues raised by the jury trial with Defendants or discussed any speech in her capacity as the foreperson with the Defendants, including the verdict.

Cerrillo also cannot link any protected speech to her termination.  Cerrillo served on the jury for eight weeks and no action by Defendants prevented her from doing so.  There is no evidence that Defendants knew about the verdict reached prior to Cerrillo's termination.  There is nothing to indicate that her jury service motivated the Defendants to terminate her.

Finally, Cerrillo would have been terminated regardless of her jury service.  Cerrillo must have some evidence that her protected speech was a substantial motivating factor behind termination and that her job would have been saved if she had not served on the jury.  However, it is undisputed that the District management personnel discussed Cerrillo's poor job performance before she was selected for jury service.  It is also undisputed that Cerrillo was on probation at the time of her release.  For these reasons, it is clear that the District would have terminated Cerrillo's employment prior to the end of the six month probationary period (December 18, 2007) irrespective of her jury service.

*Plaintiffs' Opposition*

Cerrillo argues that termination for engaging in protected speech is actionable under 42 U.S.C. § 1983 and her speech dealt with a matter of public concern, which is confirmed by the substantial news coverage that the trial and verdict received.  The speech at issue was her participation in the verdict and the collective voice of the jury that awarded $19.1 million.  Each juror's participation in that award/finding is protected speech.

There is significant evidence that shows the verdict was a substantial or motivating factor in the discharge.  A sufficient causal connection may be shown through temporal proximity.  Here, Cerrillo was terminated less than one week after the verdict was announced.  Further, both Irby and Vigil "physically expressed" their dissatisfaction with Cerrillo.  Prior to her jury service and the verdict, Vigil and Irby were friendly and Cerrillo had a good relationship with them.  After December 7, 2007, they were cold and unfriendly towards her, including an evil look from Vigil.  Vigil also remained silent when Padilla told Cerrillo that Cerrillo was missing too much work.  Also, Vigil received his masters degree from Fresno State, and the verdict received substantial media coverage.  The verdict made the front page of the *Fresno Bee* and that paper was on the break room table where Vigil and Irby would sit.  A local news station also ran an interview with Cerrillo on the night that the School Board met, and the following day Cerrillo was terminated.  Further, the stated reasons for her termination were pre-textual.  Cerrillo worked in a busy office for 28 years prior to working for the District/Irby.  In that prior job, she routinely multitasked.  Moreover, no one ever told her that she was not performing well, Irby regularly praised her work, no one told Cerrillo that she needed to improve, and there is no written documentation showing that there was a problem with Cerrillo's work.  Further, no one gave Cerrillo a performance evaluation during her probationary period of employment, despite a District policy that so required.  Deviations from protocol can show pretext.

### Legal Standard – 42 U.S.C. § 1983 First Amendment Retaliation

"Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making protected speech."  Marable v. Nitchman, 511 F.3d 924, 929 (9th Cir. 2007).  First Amendment retaliation claims against a government employer are analyzed through a sequential five-step inquiry:  (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state employer had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state employer would have taken the adverse employment action even absent the protected speech.  Huppert v. City of Pittsburg,

574 F.3d 696, 702 (9th Cir. 2009); Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).  The

plaintiff bears the burden on the first three steps, but the burden shifts to the defendant at the

fourth and fifth steps.  See Nichols v. Dancer, 567 F.3d 423, 426 (9th Cir. 2009); Eng, 552 F.3d

at 1070-72.

       With respect to the first inquiry, determining whether a matter is one of "public concern"

is not an exact science," and the Ninth Circuit relies "on a generalized analysis of the nature of

the speech." Desrochers v. City of San Bernardino, 572 F.3d 703, 709 (9th Cir. 2009).

Generally, "speech involves a matter of public concern when it fairly can be said to relate to any

matter of political, social, or other concern to the community." Huppert, 574 F.3d at 703; Eng,

552 F.3d at 1070.  In contrast, "speech that deals with 'individual personnel disputes and

grievances' and that would be of 'no relevance to the public's evaluation of the performance of

governmental agencies' is generally not of 'public concern.'" Eng, 552 F.3d at 1070; Coszalter

v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003)   Thus, "the essential question is whether the

speech addressed matters of 'public' as opposed to 'personal' interest. . . . based on the content,

form, and context of a given statement, as revealed by the whole record . . . ." Desrochers, 572

F.3d at 709.

       With respect to the third inquiry, whether protected speech was a motivating factor for the

adverse employment action is a question of fact.  Eng, 552 F.3d at 1071; Coszalter, 320 F.3d at

978.  The plaintiff may use either direct or circumstantial evidence to show a defendant's

retaliatory motive.  Ulrich v. City & County of San Francisco, 308 F.3d 968, 980 (9th Cir. 2002);

Allen v. Iranon, 283 F.3d 1070, 1075 (9th Cir. 2002).  The plaintiff must present evidence that

the defendant had knowledge of the plaintiff's protected speech.  Alpha Energy Savers, Inc. v.

Hansen, 381 F.3d 917, 928 (9th Cir. 2004); Keyser v. Sacramento City Unified Sch. Dist., 265

F.3d 741, 750-52 (9th Cir. 2001).  Once the defendant's knowledge of the protected speech is

shown, a plaintiff may circumstantially show a retaliatory motive by showing: (1) a sufficient

proximity in time between the protected action and the allegedly retaliatory employment

decision; (2) that the employer expressed opposition to his speech, either to him or to others; or

(3) that the employer's proffered explanations for the adverse employment action were false and

pre-textual.  Alpha Energy, 381 F.3d at 929; Coszalter, 320 F.3d at 977; Ulrich, 308 F.3d at 980;

Keyser, 265 F.3d at 751-52.  However, "[t]here is no set time beyond which acts cannot support

an inference of retaliation, and there is no set time within which acts necessarily support an

inference of retaliation," rather, the period of time must be considered along with the factual

setting and circumstance of the particular case.  Coszalter, 320 F.3d at 978.

With respect to the fifth inquiry, the defendant may avoid liability by showing that the

employee's protected speech was not a but-for cause of the adverse employment action.  Mt.

Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Eng, 552 F.3d at

1072.  This inquiry "asks whether the adverse employment action was based on protected and

unprotected activities, and if the state would have taken the adverse action if the proper reason

alone had existed;" it "relates to, but is distinct from, the plaintiff's burden to show the protected

conduct was a substantial or motivating factor."  Eng, 552 F.3d at 1072; Knickerbocker v. City of

Stockton, 81 F.3d 907, 911 (9th Cir. 1996).  Whether the defendant would have taken the same

adverse action against the employee irrespective of the protective speech is a question of fact.

Robinson v. York, 566 F.3d 817 (9th Cir. 2009); Eng, 552 F.3d at 1072.

*Discussion*

Of the five inquiries for a First Amendment retaliation claim, three are at issue in this

motion:  the first, the third, and the fifth.

1.      Protected Speech

The speech identified by Cerrillo is the Klein jury's verdict against FSU for $19.1 million

(hereinafter "the Verdict").  See Opposition at 16:21-23.  There does not appear to be any case

directly on point.[19]  As such the Court will proceed to analyze the Verdict under the traditional

considerations of content, form, and context.

The content of the speech was that FSU committed legal wrongs against the plaintiff

---

[19]The two unpublished cases cited by Cerrillo are not helpful.  *Davis v. California Dept. of Corrections*,
1996 WL 271001, 59-60 (E.D. Cal. Feb. 23, 1996), involved *inter alia* service on a grand jury, but there was no
discussion regarding First Amendment protections or verdicts.  *Johnson v. Appliance & T.V. Centers*, 1987 WL
16942, *6-*7 (M.D. N.C. May 7, 1986) also involved a grand jury, but was a 28 U.S.C. § 1875 case.  Like *Davis*,
there was no discussion regarding jury verdicts or the First Amendment.

1  (Johnson-Klein) and that $19.1 million  was the amount that FSU should pay because of the legal

2  wrongs that it inflicted upon Johnson-Klein.

3      The form of the speech would have been non-verbal.  The jury as a whole made its

4  determinations in response to questions presented through the Fresno County Superior Court.

5  Specifically, the jury would have marked a verdict form that found that FSU legally harmed the

6  plaintiff (Johnson-Klein).  The jury would have then written a specific dollar amount for various

7  types of damages.  This form of speech was not disruptive and not extensive, rather it was a

8  series of simple answers to a series of questions posed by a state court.

9      Finally, the context of the speech is that of a jury trial.  In particular, the context is that of

10  a jury giving its verdict in a case in which a state university is the defendant.  Again, the Court is

11  unaware of any case directly on point.  However, in the context of a witness's compelled

12  courtroom testimony, the Third Circuit has found such testimony to be protected.  The Third

13  Circuit has explained that the public interest strongly favors protection of subpoenaed testimony

14  because it "implicates not only the integrity of the truth seeking process and the effective

15  administration of justice, but also the public's interest in protecting court-ordered conduct."

16  Green v. Philadelphia Hous. Auth., 105 F.3d 882, 888 (3d Cir. 1997).[20]  Without protection for

17  such testimony, the "judicial interest in attempting to resolve disputes by arriving at the truth [is

18  put] in jeopardy."  Id. at 887.  Further, a "subpoenaed witness has no choice but to appear at a

19  trial, unless he is willing to risk a finding of contempt."  Id. at 888.

20      The Court believes that similar concerns would also apply to a jury's verdict.  "Jury

21  service is both a duty and a right of citizens of the United States. It is an essential component of

22  our system of justice, and is integral to the protection and preservation of our constitutional

23  freedoms."  Madison v. District of Columbia, 593 F.Supp.2d 278, 285 (D. D.C. 2009).  Our

24  conception of a jury trial posits that citizens will base their verdicts on the evidence that is

25  presented at trial.  It is anathema to our system that a fear of retaliation, instead of the evidence

26  _____

27      [20]The Ninth Circuit has recognized that there is a split among the circuits regarding under what
    circumstances a witness's trial testimony receives first amendment protection.  See Alpha Energy, 381 F.3d at 926
28  n.6.  Some Circuits give all testimony First Amendment protection, while others do not.  See id.  The Ninth Circuit
    declined to adopt either approach.  See id.  As such, the Court cites the Third Circuit as persuasive authority for the
    limited question presented in this case.

presented, would dictate the results of a trial.

Also, in California, those who serve on a jury are summoned to appear for service by a jury commissioner.[21]  See Cal. Code Civ. Pro. § 208; cf. 28 U.S.C. § 1866(b) (clerk of the court issues jury summonses).  If a person fails to obey the summons, they may be attached and compelled to attend; following a hearing, they may be found in contempt and subject to a fine and/or incarceration.  See Cal. Code Civ. Pro. § 209; cf. 28 U.S.C. § 1866(g) (person may be subject to a $1,000 fine, three days imprisonment, and/or performance community service). Prospective jurors are therefore compelled to attend court.  Later, if a person is selected to be a juror, they are then required to attend the trial, listen to the evidence, deliberate, and generally give one of several responses in a civil case:  liable, not liable, amount of damages, or deadlocked.  Jurors are therefore required to participate in a trial and are required to speak/give answers, even if their collective answer is "we do not know"/deadlock.

In sum, the speech in this case is not extensive or disruptive, it is a form of compelled speech that is in response to a series of questions posed by a court, and it indicates that FSU (a state university) legally damaged a former employee and should pay $19.1 million because of its improper conduct.  The public has an interest in the proper and lawful functioning of its universities, including whether university employees are sexually harassed by university administrators.  Cf. Freitag v. Ayers, 468 F.3d 528, 545-46 (9th Cir. 2006).  The public also has a strong interest in ensuring that our system of justice functions in an unbiased manner and that its juries reach verdicts without fear of retaliation.  Cf. Green, 105 F.3d at 887.  Given these considerations, Cerrillo's speech, that is the jury's Verdict, is speech on a matter of public concern and is protected by the First Amendment.  Summary judgement in favor of Defendants on this ground is denied.

### 2.    Substantial or Motivating Factor

Cerrillo relies on five circumstances to show that the Verdict was a substantial or motivating factor in her termination: (1) timing, (2) changes in demeanor, (3) a lack of

---

[21]A county's jury commissioner is generally selected by the judges of the superior court for that county.  See Cal. Code Civ. Pro. § 195(a).

documentation or warning that she was performing unacceptably, (4) she had the required skills to perform the job, and (5) she did not receive her mandated work performance evaluation.

There is a problem with causation for this cause of action. It is apparent that Defendants were not pleased with Cerrillo's job performance months before the Verdict. There is no genuine dispute that complaints had been made about Cerrillo and that she was perceived as having deficiencies even before she was called for jury service. See DUMF Nos. 5, 6. There is no genuine dispute that Irby had spoken with Vigil prior to October 2007 about Cerrillo, and the gist of those conversations was that Cerrillo may not become permanent because she was not meeting expectations. See DUMF 8; Irby Depo. at 81:11-83:6; see also DUMF Nos. 5, 6. In fact, Vigil indicated that his understanding of the September 2007 meeting with Irby was that Cerrillo would be terminated prior to becoming permanent. See Vigil Depo. at 59:10-19. Importantly, there is no genuine dispute that it was discussed at District management meetings (at which Vigil and Irby attended) that Cerrillo was not meeting expectations, was not "catching on" to her job duties, and the possibility of releasing Cerrillo prior to the expiration of her six month probationary period (December 18, 2007) was raised. See DUMF 9; Hammond Dec. at ¶¶ 4-5; Irby Dec. at ¶ 3; Vigil Dec. at ¶ 3. These meetings occurred prior to October 2007 and thus, could not have possibly been influenced by the then non-existent Verdict. See id. Further, after Cerrillo began jury service, management meetings included discussions that Cerrillo should not be terminated until after the completion of her jury service. See Hammond Dec. at ¶ 5; see also Vigil Depo. at 59:18-24; Simpson Depo. at 53:19-25. Such a conversation could not have been influenced in any way by the then non-existent Verdict. Therefore, Cerrillo's termination was substantially contemplated, if not decided, more than two months before the Verdict was even reached. See Hammond Dec. at ¶¶ 4-5; Irby Dec. at ¶ 3; Vigil Dec. at ¶ 3; Irby Depo. at 81:11-83:6; Vigil Depo. at 59:10-24; Simpson Depo. at 53:19-25. In the context of Title VII,[22] it has been held that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated,

_____

[22]Although claims brought under Title VII apply a different burden shifting framework than § 1983 First Amendment retaliation claims, the Ninth Circuit still considers Title VII cases to be informative on the issue of causation. Lakeside-Scott v. Multnomah County, 556 F.3d 797, 804 n.8 (9th Cir. 2009).

though not yet definitively determined, is no evidence whatever of causality." <u>Clark County Sch.</u> <u>Dist. v. Breeden</u>, 532 U.S. 268, 272 (U.S. 2001).  This holding has been extended to previously contemplated terminations and reassignments following a plaintiff engaging in protected activity. <u>See</u> <u>Mauder v. Metro. Transit Auth. of Harris County</u>, 446 F.3d 574, 584-85 (5th Cir. 2006); <u>Cichon v. Exelon Generation Co., LLC</u>, 401 F.3d 803, 811 (7th Cir. 2005); <u>Windfelder v. May</u> <u>Dep't Stores Co.</u>, 93 Fed. Appx. 351, 355 (3d Cir. 2004); <u>cf.</u> <u>Cotton v. Cracker Barrel Old</u> <u>Country Store, Inc.</u>, 434 F.3d 1227, 1232 (11th Cir. 2006).  Since Cerrillo had been perceived as having deficiencies, her termination was actively contemplated if not decided prior to October 2007 (well before the Verdict), it was discussed that Cerrillo should not be terminated prior to completion of jury service, and her probationary period ended on December 18, 2007 – that Cerrillo was fired on December 12, 2007, that is after three working days following the Verdict, is insufficient to establish causation.  <u>See</u> <u>Clark</u>, 532 U.S. at 272; <u>Mauder</u>, 446 F.3d at 584-85; <u>Cotton</u>, 434 F.3d at 1232; <u>Cichon</u>, 401 F.3d at 811; <u>Windfelder</u>, 93 Fed. Appx. at 355; <u>Coszalter</u>, 320 F.3d at 978 (holding that the period of time must be considered along with the factual setting and circumstance of the particular case).

With respect to the lack of work performance evaluations, District Board Policy BP 4216 reads in relevant part, "Probationary employees shall receive written performance evaluations by their supervisor during the probationary period.  These evaluations shall indicate whether the evaluator is satisfied or not satisfied with the employee's ability, performance, and compatibility with the job."  Albert Dec. Exhibit 10.  Cerrillo is correct that a failure to follow policies or protocols  may indicate a discriminatory motive.  <u>See</u> <u>Porter v. California Dept. of Corrections</u>, 419 F.3d 885, 896 (9th Cir. 2005).  However, Cerrillo has presented no evidence regarding how BP 4216 is interpreted or implemented within the District.  BP 4216's text does not explain when or how often evaluations are to be given, and it does not require that any evaluations be given prior to termination.  As discussed above, Cerrillo's termination had been actively contemplated if not decided well before the Verdict, and it was discussed that Cerrillo should not be terminated prior to completion of her jury service.  <u>See</u> Hammond Dec. at ¶¶ 4-5.  BP4216 does not state that a probationary member must receive evaluations even if it has essentially been determined

that the probationary employee will be terminated.  Moreover, given the time frames involved, the Court does not see how a failure to give Cerrillo a BP 4216 evaluation could reflect any animus or discrimination whatsoever regarding the Verdict.  From mid-June through December 6, 2007, i.e. more than five and half months of probationary working days that pre-dated the Verdict, Cerrillo received no evaluation.  This significant passage of time without any evaluations indicates that the Verdict had nothing to do with the alleged deviation from protocol. Further, between December 7, 2007 and December 18, 2007 is a total of seven working days.[23] This is a very short amount of time in which to implement any suggested changes or to address noted deficiencies.  This is also a short period of time in which to terminate Cerrillo while she was still a probationary employee.  If the decision had essentially been made to terminate her within the probationary period, then it is unknown why an evaluation would be given when there is little time either for Cerrillo to implement improvements or to terminate her within the probationary period deadline.  Considering the short amount of time between the Verdict and December 18, 2007, the Defendants' prior discussions about Cerrillo, and the failure to give an evaluation in the more than five and a half months of probationary employment that pre-date the Verdict, it is unreasonable to infer that the failure to give Cerrillo BP 4216 evaluations reflects a discriminatory/retaliatory animus in relation to the Verdict.  The failure to give Cerrillo a BP4216 evaluation is not probative.

With respect to a lack of written documentation or verbal notice about her deficient job performance, the argument as it stands now is not persuasive.  Despite a lack of written documentation, there is no actual dispute that complaints about Cerrillo were made and that she was perceived to be deficient.  Cerrillo has cited no evidence, policy, or case law that require an employer to document its displeasure, criticisms of, or complaints received about a probationary employee or to tell the probationary employees that they need to improve.  Cerrillo has presented BP 4216, which, as explained above, indicates that probationary members are to receive evaluations.  Again, however, there is no evidence regarding BP 4216's interpretation or implementation.  The policy does not: (1) say how often or when evaluations are to occur; (2)

---

[23]As a probationary employee, Cerrillo could be terminated without cause.  DUMF 4.

1   require that an evaluation be given prior to termination; (3) discuss how to handle complaints

2   made about a probationary employee; or (4) mandate that documentation regarding criticisms or

3   complaints be generated.  Instead, BP 4216 states generally that a probationary employee is to

4   receive evaluations.  Without more, the lack of written documentation is insufficiently probative.

5       With respect to the argument that Cerrillo had the necessary job skills, Cerrillo's

6   personal, unsupported, subjective assessment of her job performance is not probative.  Cornwell

7   v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 n.6 (9th Cir. 2006); Bradley v. Harcourt,

8   Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996).  Also, Cerrillo's personal assessment is

9   consistent neither with the complaints that Irby and Vigil received nor the telephone etiquette

10  packet that Simpson sent to Cerrillo on October 19, 2007.  Although Simpson may have written

11  in the e-mail "keep up the good work," the fact that Cerrillo received such a packet indicates that

12  the way in which Cerrillo handled her telephone duties was not wholly acceptable.  Otherwise,

13  there seems to be no reason why Cerrillo would be given such a packet.  Additionally, the

14  declaration of Ray Eggebraaten, Cerrillo's former employer at the court reporting services

15  company, is of limited value.  It is not clear that the duties, tasks, expectations, and equipment

16  between the two jobs are completely analogous.  Assuming that they are sufficiently analogous,

17  as explained above, it is undisputed that months before the Verdict, Vigil and Irby received

18  complaints about Cerrillo, District staff (including Vigil and Irby) formed the opinion that

19  Cerrillo's performance was not adequate, and Irby believed that she was not fitting the particular

20  position.  In light of such evidence, Eggebraaten's evaluation of, and experience with, Cerrillo at

21  a different time and at a different job is insufficiently probative.[24]

22      With respect to the changes in demeanor, Cerrillo is correct that an employer's reaction to

23  a discriminatory statement, or reaction to an employee's legitimate civil rights activities, may be

24  evidence of a discriminatory intent.  See Chuang v. University of Cal., Davis, 225 F.3d 1115,

25

26  [24]Cerrillo also indicates that when an employer gives one reason for its actions at the time of termination
    but then gives a different reason at a later time, this can indicate a discriminatory motive.  Cerrillo argues that at
27  termination, Defendants gave no reason for her termination, but now identify various deficiencies.  The Court fails to
    see how giving no reason at the termination (essentially silence) and then actually giving a reason at a later time is
28  similar to giving two different reasons at later times.  The later breaking of silence and naming a reason does not
    seem to be the same as changing reasons because there is no real inconsistency with breaking silence.  Cerrillo's
    argument is not persuasive.

1128 (9th Cir. 2000) (holding that a discriminatory intent was shown not only by a speaker who used the term "chink," but also by a listener when the listener laughed at the statement).  Further, Cerrillo also is correct that a pattern of antagonism may indicate a discriminatory motive.  See Porter, 419 F.3d at 895-96 (finding timing plus evidence that defendants made veiled threats against plaintiff, refused various employment requests simply because plaintiff was the person making the requests, gave intimidating glares and engaged in crude behavior, ate plaintiff's food without permission and then spat in the remainder supported an inference of causation).  Although Cerrillo states that Irby and Vigil engaged in a "pattern of hostility" towards her, all that is described beyond that conclusory statement is that Irby and Vigil often would not make eye contact and stopped talking to Cerrillo in their typical manner, i.e. would not speak to her in the same friendly and chatty way that they did prior to December 7.  See PUMF Nos. 64-70.  This is significantly different from the conduct that was described in *Porter* and cannot reasonably be called a "pattern of hostility."  Further, the only evidence cited in support of these assertions is Cerrillo's declaration (paragraphs 45 to 51), that is, her own subjective opinion.  A plaintiff's own, unsupported, subjective evidence regarding an employer's changed behavior or tone is generally viewed with significant skepticism.  See Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999); Piraino v. International Orientation Resources, 84 F.3d 270, 274 (7th Cir. 1996); Anthoine v. N. Cent. Counties Consortium, 571 F.Supp.2d 1173, 1189 (E.D. Cal. 2008); Vasconcellos v. Pier 1 Imps. (U.S.), Inc., 2008 U.S. Dist. LEXIS 105957, *17-*18 (D. R.I. Apr. 28, 2008);  Escobar v. University of N. Tex., 562 F.Supp.2d 804, 809 , 811 (E.D. Tex. 2007); Sheville v. Am. West Airlines, Inc., 2006 U.S. Dist. LEXIS 88058, *20-*21 (D. Ariz. Dec. 4, 2006); Agha v. Rational Software Corp., 252 F.Supp.2d 1074, 1086 (D. Or. 2003);[25] but cf. Rogers v. Alternative Res. Corp., 440 F. Supp. 2d 366, 377 (D. N.J. 2006).  The lack of eye contact and lack conversation by Irby would have lasted at most three days, until Cerrillo's termination on December 12, 2007.  The conduct described is minor.  Further, given the discussions at management meetings that Cerrillo was not working out, that she may be terminated prior to the six month probationary period, the probationary period was very close

---

[25]Reversed in part on other grounds by, 97 Fed. Appx. 748 (9th Cir. 2004).

(December 18, 2007) to ending, and critically that she should not be terminated until her jury

service was complete, it is not surprising that Irby's demeanor may have changed since he was

about to terminate her employment.  With regard to Vigil, Cerrillo's deposition testimony

indicates that her opinion was based on only a single incident on December 11, 2007, the day

prior to her termination (and the evening that the District Board would have approved her

termination).  See Cerrillo Depo. at 258:13-20.  Just as with Irby, that Vigil's demeanor changed

on what was effectively Cerrillo's last day is not surprising.  Also, that he did not speak to

Cerrillo and gave her a look that she felt was unfriendly on December 11, 2007, is too brief,

isolated, and subjective to be sufficiently probative.  Cerrillo's subjective evidence regarding a

change of demeanor, which boils down to a personal belief that Irby and Vigil were no longer as

friendly and talkative, is insufficiently probative to raise a genuine material dispute.

Finally, Defendants also argue that there is no evidence that Irby or Vigil knew of the

Verdict prior to Cerrillo's termination.  The person who made the decision to terminate Cerrillo's

employment was Irby, although Vigil authorized that decision.[26]  See PUMF 72; Vigil Depo. at

24:1-7; Irby Depo. at 81:13-16.  No party disputes that Cerrillo did not tell Irby or Vigil about the

Verdict or what the Verdict was.  DUMF 24.  Irby declares that he took no interest in the Klein

Case or the Verdict, did not follow the Klein Case in the media, is not a fan/supporter of FSU

athletics, and that he did not consider the Klein Case in anyway with respect to Cerrillo's

employment.[27]  See Irby Dec. at ¶¶ 7-9.  Cerrillo's arguments as to the local media's coverage of

the Klein Case does not show that Irby himself took an interest or that he was aware of the

Verdict.  Cerrillo points out that Vigil obtained a graduate degree from FSU,[28] but she does not

have a similar link with Irby to FSU and she does not describe any other links or attitudes that

Vigil has towards FSU.  Further, although Cerrillo testified that she saw Vigil at the lunch room

---

[26]Irby's consultation with Vigil about Cerrillo appears to have occurred in September 2007 (prior to October 2007/jury service) and was in the nature of a discussion whereby Vigil asked about Cerrillo, Irby gave his thoughts and observations, and then Vigil said that his own observations were consistent with those of Irby.  See Irby Depo. at 81:13-83:6; Vigil Depo. at 24:2-25:6, 59:5-19.

[27]Vigil made similar declarations.  See Vigil Dec. at ¶¶ 7-8.

[28]There is no other evidence or detail regarding Vigil's connections with FSU.

23

table and that a copy of the *Fresno Bee* was on that table (the headline for that day announced the Verdict in large typing), she does not say that she saw Irby at the table at anytime that day or that she saw Irby with or a near a copy of the December 7 *Fresno Bee*. There is no evidence that Irby had any interest in the Klein Case, and Cerrillo has presented no evidence that Irby was aware of the Verdict at the time of termination. If Irby did not have knowledge of the Verdict, then the Verdict could not have been a substantial or motivating factor in the decision to terminate Cerrillo's employment.[29] See Alpha Energy, 381 F.3d at 928; Keyser, 265 F.3d at 750-52. Similarly, it is unclear what interest the District would have with the Klein Case. There is no evidence that the District or West Park Elementary has any connection to FSU or Johnson-Klein, and it is entirely unknown how the Verdict would affect the District or why the District would wish to retaliate against the Verdict. The Verdict has nothing to do with the District or West Park Elementary, and the Verdict is neither a criticism nor a condemnation of the District or West Park Elementary.[30]

In light of the entirety of the above discussion, Cerrillo has not presented sufficient evidence that the Verdict was a substantial or motivating factor in her termination. Cerrillo's evidence is "'merely colorable' or 'is not significantly probative,'" and a reasonable jury could not find that the Verdict was a substantial or motivating factor in Cerrillo's termination. Anderson, 477 U.S. at 249-50; Hardage, 427 F.3d at 1183. Summary judgment in favor Defendants on this cause of action is appropriate.

---

[29]The circumstantial evidence suggests that Vigil would have an interest in the Verdict because he is an FSU alumnus and at least had the opportunity to see the Verdict because of the *Fresno Bee* headline. Assuming that Vigil was aware of the Verdict, it is unclear whether Irby and Vigil even discussed Cerrillo's position in December 2007 or ever discussed the Verdict. Further, there is no evidence in the record regarding Vigil's attitude towards FSU, be it positive or negative. It is true that the Ninth Circuit has held that, even if one decision maker had no discriminatory animus, where another "person who exhibited discriminatory animus influenced or participated in the decision making process, a reasonable factfinder could conclude that the animus affected the employment decision." Dominguez-Curry v. Nevada Transp. Dept, 424 F.3d 1027, 1039-40 (9th Cir. 2005). However, in this case, there is insufficient evidence that Vigil displayed a discriminatory animus in relation to the Verdict. The closest evidence of animus by Vigil is the December 11, 2007, encounter (which was the only time Cerrillo thought that Vigil behaved in a changed manner) in which Vigil did not speak and Cerrillo felt that he gave her an unfriendly look. Such evidence is too isolated, brief, and subjective to adequately show some sort of animus in regards to the Verdict.

[30]Cerrillo also mentions that her television interviews appeared on the local 6 o'clock news broadcast on December 11, 2007, the District's Board met on December 11, 2007, and she was terminated on December 12, 2007. However, there is no evidence that the District's Board or any Defendants were aware of or saw the interviews.

1    **II.    Remaining State Law Claims**

2        This Court has supplemental jurisdiction over Cerrillo's state law claims.  Under 28

3    U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state

4    law claims if "the district court has dismissed all claims over which it has original jurisdiction."

5    The general rule is "when federal claims are dismissed before trial . . . pendent state claims

6    should also be dismissed."  <u>Religious Tech. Ctr v. Wollersheim</u>, 971 F.2d 364, 367-68 (9th Cir.

7    1992); <u>Scholar v. Pacific Bell</u>, 963 F.2d 264, 268 n.4 (9th Cir. 1992); <u>Schultz v. Sundberg</u>, 759

8    F.2d 714, 718 (9th Cir. 1985).  When removal is based on the presence of a federal cause of

9    action, a district court may remand pendent or supplemental state law claims to the state court

10   once the federal claims have been eliminated.  <u>See</u> <u>Lee v. City of Beaumont</u>, 12 F.3d 933, 936

11   (9th Cir. 1993).  In fact, "it is generally preferable for a district court to remand remaining

12   pendent claims to state court."  <u>Id.</u>

13       This case was removed on the basis of a federal question, that is, the 42 U.S.C. § 1983

14   First Amendment retaliation claim.  <u>See</u> Court's Docket Doc. No. 1 ("Notice of Removal) at ¶ 4.

15   Since that claim, which is the only federal claim, has been resolved and only state law claims

16   remain, the Court will remand the remaining state law claims to the Fresno County Superior

17   Court.  <u>See</u> <u>Schultz</u>, 759 F.2d at 718.

18

19                                          **CONCLUSION**

20       The evidence submitted shows that, prior to October 2007 and well before the Verdict

21   was handed down, complaints about Cerrillo's performance had been made, Defendants were not

22   satisfied with Cerrillo's job performance, and Defendants had discussed releasing her at

23   leadership meetings prior to the completion of her probationary term.  Also prior to the existence

24   of the Verdict, Defendants had discussed the need to wait to terminate Cerrillo until after her jury

25   service.  Cerrillo's evidence does not adequately address these facts and critically, does not

26   indicate that the Verdict was a substantial or motivating factor in her termination.  The failure to

27   give Cerrillo BP 4216 evaluations does not show retaliatory intent in regards to the Verdict

28   because of the time frames involved and the lack of evidence regarding BP 4216's interpretation

or implementation.  The lack of written documentation of complaints/criticisms is not probative since there is no actual dispute that complaints had been made and negative opinions had formed well before the Verdict, and no requirement has been identified for such documentation to be kept.  Cerrillo's evidence regarding changes in demeanor is insufficiently probative in relation to the Verdict because of the time frames and the brief, isolated, and subjective nature of the evidence presented.  Finally, Cerrillo's subjective opinion of her work performance is too subjective, and that Cerrillo may have performed adequately for Eggebraaten does not change the complaints, opinions, and discussions by District personnel prior to the Verdict.  None of the evidence presented is sufficiently linked to the Verdict.  Because Cerrillo has not presented enough evidence for a reasonable jury to conclude that the Verdict was a substantial or motivating factor in her termination, summary judgment on Cerrillo's 42 U.S.C. § 1983 claim will be granted.

   With the resolution of the only federal claim in this case, all that remains are state law claims.   The Court declines to exercise supplemental jurisdiction and will remand the remaining state law claims to the Fresno Superior Court.


   Accordingly, IT IS HEREBY ORDERED that:

1. Summary judgment in favor of Defendants on Plaintiff's 42 U.S.C. § 1983 claim is GRANTED;

2. All currently set dates and deadlines, including the trial and pre-trial conference dates, are VACATED; and

3. This case is REMANDED forthwith to the Fresno County Superior Court.


IT IS SO ORDERED.

**Dated: December 17, 2009**     **/s/ Anthony W. Ishii**
              CHIEF UNITED STATES DISTRICT JUDGE